Before we proceed with our regular business, I'd like to turn it over to Judge Hughes for a motion. Good morning. I've been in admission this morning. This is the time of year, or at least for me, that I unhappily have to let my current clerks move on, although I'm happy to see them move on and go to other things. Fortunately, the judiciary gets to keep this clerk another year. She's going to go clerk for a district court judge in Worcester, Massachusetts for a year, and I'm sure she will prove as able of a clerk for him as she did for me. So that said, I move the admission of Rebecca Gentile, who is a member of the Bar and is in good standing with the highest court of Massachusetts. I have knowledge of her credentials, and I'm satisfied that she possesses the necessary qualifications. Judge Plater? I second the motion. I am delighted to grant the motion. I'm reminded to proceed. Please return to your seat. You solemnly swear to report yourself as an attorney and counselor of this court, uprightly and according to law, in the human support of the Constitution of the United States of America. I do. Thank you. Okay. All right. First case this morning is 18-1389, Dakin Industries v. Shimura Company. Mr. Lo Cicero? Yes, Your Honor. Let me just say at the outset that there was a request to close the courtroom because of confidential matters. I'll just tell you, I've been here 19 years, and I think I've closed the courtroom once or twice. So if we need to address that, we'll be mindful of the confidentiality restrictions. Thank you, Your Honor. Good morning, Your Honor. This is Anthony Lo Cicero for appellants Dakin Industries and Dakin America. With me is my colleague, Mary Mikulski. At the outset, Dakin has standing to challenge the decision of the Board of Appeals. First, Dakin and Shimura are direct head-to-head competitors in the market for the sale of refrigerants. There are only five players in the world. By 2014, Dakin's customers, Honda and another automaker, had asked Dakin to supply it with the refrigerant at issue, HFO-1234YF, which I'll refer to as YF. Dakin told both of these automakers that the 709 patent, the patent at issue here, presented issues that Dakin needed to address. Honda asked Dakin for a formal price quote to provide YF to its U.S. facilities, and Dakin declined because it respects the intellectual property rights. Let me make a suggestion. I have my own views that I'm satisfied with based on the briefing, so I'm going to move on to the merits. Yes. On the merits, the Board either committed legal error by relying on the hearsay statement in the Miller reference for its truth, not for what it teaches, but for the truth of the statement contained therein, or it abused its discretion when it said it did not affirmatively rely on Dr. Sun's experiments and data, Dr. Sun being Kim Moore's patent owner's expert. The Board, we made a motion to exclude those experiments on the grounds that they started with the wrong starting compound. And the Board said we did not affirmatively rely on Dr. Sun. So are you suggesting that the Board was misstating what they had done? I don't think so, Your Honor. I think that what's curious is the word affirmatively, but I think Your Honor is right. I think that the Board did not rely on Dr. Sun's experiments, and I think that therefore the only support for the Board's conclusion is that Dakin did not meet its burden of proof. And if we turn to Appendix 20, the portion of the Board's decision identifying the evidence it relied on, it said patent owner Kim Moore's directs us to evidence that it was known that dehydrofluorination of reactions can occur in reactors in the absence of a catalyst. In particular, Miller, the reference in question, discloses that dehydrofluorination of HFC245Cb can be carried out in a reaction zone at elevated temperatures in the absence of a catalyst. Miller further teaches that the appropriate temperatures are between 350 and 900 degrees centigrade. Miller indicates that the length of the reactor, that is including one or more catalysts. We're reading along with you, but what's your argument here? This is hearsay? Yes. This is a discussion of what Miller discloses. That's right, and what Miller discloses is that such a reaction can occur. What the Board did was it violated its own rules by considering this statement for the truth of the matter, not for the disclosure, not for example, a worker skilled in the art would think to do certain things because of this disclosure, or the claims say this and this discloses something else, but the truth of the proposition that this reaction can and indeed did occur in this case when Mr. Takahashi reproduced example one of Miller, and that's a violation of the rule 42.61 of 37 CFR, which says that a specification and drawings of a patent are admissible evidence only to prove what they describe. They are not the truth of the statement, and it's not— I'm not sure what difference that makes. I mean the problem, it's your burden of proof, and you didn't submit any evidence that Miller inherently discloses this process or enough. I mean this seems like a bizarre patent to me too that the reason they got the patent was they claimed an impurity in addition to the actual substance, but there must be plenty of opportunities for you to get expert testimony or do the exact process rather than do a variant of Miller to show that every skilled artisan would know that impurities always result from this. You didn't do it. So the fact that the board relied on part of Miller to show that it could do this process in a way that wouldn't necessarily result in impurities in the way their claim does, I don't see, even if we reject that, how you've still met your burden of proof to show that Miller inherently discloses impurities. In order to have complied with the requirements for the reproduction of the experiment, Dykin was required to demonstrate that any deviations were material, and Mr. Takahashi did. He said— Why didn't you just do it exactly like Miller? Frankly, I don't understand why either of you didn't replicate Miller. You didn't replicate Miller exactly. They didn't replicate Miller exactly. What are you all dancing around here? That was my question also. Is there some compelling reason why Takahashi didn't do what Miller said? Then you would have had—then this argument would not even be in front of us. There is no way for me to answer that but to say you're correct, Your Honor. However, what Mr. Takahashi said was that he believed that even without the catalyst, the reaction would mostly not progress, and that even if it did, there would not be a sufficient amount of product generated that would affect this result. So the answer to your question is that he used the material that he had, same justification that Dr. Sun gave for not reproducing the example one of Miller, starting with a different starting compound. He used what he had, and it was his testimony that that was an immaterial deviation. And the board disagreed, which we reviewed for substantial evidence, right? Yes, Your Honor. But the problem is that there was no evidence to—no admissible evidence to contradict Mr. Takahashi's statement. The only evidence that the board relied on was the statement in Miller, one sentence in paragraph 42, to the effect that this reaction, dehydrofluorination, can occur in a catalyst-free zone. That is not evidence that it did occur in this case. But does it have to be evidence that it did occur, or does it just have to be because it's pointed to as prior art as evidence of what a skilled artisan would understand would occur? Isn't that what the board said about that paragraph in Miller? I think that it said, but— I mean, the board is allowed to rely on Miller as evidence of what a skilled artisan would think about the process, right? That's what prior art discloses. That's correct, Your Honor. So if they relied on it in that sense and said Miller demonstrates that a skilled artisan would understand that this process may not always happen, or it may happen in non-catalyst parts of the tube or whatever, then what's wrong with that conclusion? What's wrong with it is that it's being offered—it is a statement of what a worker skilled in the art would think, but Mr. Takahashi, who performed the experiment and who testified on the road and gave direct and admissible testimony, said that in his view, as a worker skilled in the art— Sure, but are you suggesting that the board can't read a reference and say this shows a skilled artisan would think X? That is all that the board can do. Well, so they did that, and they read Miller and said a skilled artisan would think this of Miller. Your expert says a skilled artisan would think something else. Don't they get to judge the evidence and weigh it? And isn't that an all—I mean, we can't review that. I think that they could have if they could weigh, certainly weigh, admissible evidence. But again, are you suggesting that the board's reading of what Miller discloses a skilled artisan would think is not admissible evidence? Not for the truth. You're not answering the question. They're not relying on for the truth of what happened in this specific experiment that your expert did. They're saying Miller discloses that a skilled artisan would understand X. Can they read Miller that way? Yes, they can. Well, isn't that what they did? No. They went further. They said that that is evidence that that's what did occur. But they also said that that's what a skilled artisan would understand, didn't they? Yes. Even if they went further, isn't that understanding of the skilled artisan sufficient to affirm their finding? I don't think so, Your Honor. I think that there's no direct evidence of what would happen in this particular case. And that's the dispute. There's no direct evidence of what would happen in a specific case. Don't you lose? You've got the burden. The evidence that was Mr. Takahashi's testimony, that in his view, as a worker skilled in the art, the presence of a catalyst-free zone would not create a material difference in the outcome of the result. So what? They're not obligated to accept his testimony. They could reject his testimony, too, and say no evidence. Which is what they did. Because he didn't replicate Miller. I mean, it comes back to that problem is he didn't replicate Miller. They weren't convinced that the differences were immaterial, so they rejected his testimony. All this back and forth about whether it was permissible to rely on Paragraph 42 or not seems to me beside the point. I mean, what evidence besides his testimony do you have that Miller inherently discloses this? Well, the other evidence that they should have been able to rely on, in the view of the Board not excluding it, is Dr. Sun's proof-of-concept experiments. Because those experiments, as Mr. Takahashi said and testified in his second declaration, demonstrate that the catalyst-free zones could not have generated the amount of impurities that Mr. Takahashi found when he replicated the Miller experiment. There were two orders of magnitude. So even Dr. Sun's experiments demonstrated that there was not – that those catalyst-free zones could not have altered the results and that the only place for the impurities to have been created was in the catalytic zone, which is what the Miller experiment is and what Mr. Takahashi replicated. If neither you, the petitioner, nor the patent owner prove their cases, because neither of them had experts who could replicate Miller apparently, and the PTAB looks at Miller and says, here's the prior art, who loses? If that were the case, then the petitioner would lose. But in this case, and I see them into my rebuttal time, the point that we're making is that Mr. Takahashi said that his use of a longer catalyst-free zone was an immaterial deviation and that that evidence should have carried the case. And I'll reserve the remainder of my time for the debate. Thank you. Good morning, Your Honors. May it please the Court. My name is Dipu Doshi. I'm here for the appellee, Kim Morris. Judge Hughes, to your point, I think that's exactly the point on appeal. This really should be a substantial evidence case that Dykin failed to meet its burden. And they are arguing that all of this is the linchpin to their argument, really, is the hearsay argument. And we don't even need to consider whether or not it is hearsay, because in the first instance, Dykin — Let me ask you. Sure. This is just purely a composition claim, right? It's not a method claim? Correct. And it's a composition claim. Could you claim just the underlying composition, or was that already well known in the art? I apologize. The composition without the impurities. The composition without the impurities. You don't have a — that's not this claim. This claim depends on a certain level of impurity. That is correct. Okay. I mean, it just seems like a really odd thing that if you couldn't have claimed the composition — I mean, I know our precedent allows it, but now you can claim it just because you've noticed that, you know, in the ordinary process of making this, an impurity is created. I mean, you're lucky your friend on the other side didn't come up with good evidence, because it seems to me everybody would know that you're going to get a certain level of impurity in making this kind of composition. Well, this impurity in particular — and this is — unfortunately, this isn't part of the record, but this impurity in particular does have some added properties to it. You're saying it has some utility to the specific application? Yes. So it's not really just an impurity. It's something that's going to add to the — is it like refrigerant or coolant or something like that? That is correct, yes. Okay. Is that in the specification anywhere? It's not in the specification. So it's not really anything you could rely on to show that it's non-obvious or something like that? Well, that wasn't — I know. I know. That's not. That wasn't the argument. That's not this case. Right. Exactly. Again, I think you're lucky your friend didn't come up with better prior art and expert testimony. Well, right. We would have certainly introduced that evidence had that been in play. Well, I don't know how you could introduce it as relevant if it's not in your claims or your specification. Well, it's not in the claims. It's not in the specification. There is some testing that was done by our client. That's not part of the record, of course. So we're just talking here. In terms of the principal argument that Dykin relies on is that the board improperly relied on Milo 42. Again, I don't think we need to get there because Dykin has waived that argument. And even without Milo 42, even if the court were to decide that it's hearsay and that Dykin did not waive it, there's substantial evidence to support the board's decision. So with the waiver argument, the 4264C is clear, Rule 4264C. A motion? Okay. So the board rejected their expert because the experiment was different and they found the differences were not immaterial, right? I'm not trying to trick you. That's correct. Yeah, that is correct. Yes. Right. So if we get rid of the board's reading of paragraph 42 in Miller, what substantial evidence supports that decision in rejecting their expert's testimony? Because I think it's pretty clear that if their expert's testimony was properly rejected, then they're out no matter what we do with all this hearsay. Is there anything that supports the rejection other than the board's reading of Miller? Yes. I mean, I think this goes to Judge Plager's point, which is, you know, if there's no evidence on one side and no evidence on the other, the Petitioner loses. But there is more than that. There's Dr. Sun's testimony. There's the 281 patent. There's Mr. Takahashi's admission himself. And this is all in the context of their burden to prove that they faithfully executed the Miller Example 1. And we still don't know to this day why he made the deviation that he did in using such a much longer reactor. Do we know why your expert made the deviations when he did his test? So she did her test without the catalyst. It was a proof of concept experiment that she made. She didn't, in Appendix 2157, she- I mean, she didn't replicate Miller exactly. She did not. No, Your Honor. I suspect there's a reason your expert didn't do it, more so than his. So she didn't have it on hand. 245CB is a starting material that Comoros does not use for its YF production. So that is the reason. It wasn't on hand. And because of the limited time amounts in these proceedings, she wasn't able to get hold of that. So, again, her experiments were without a catalyst and just simply showing that the longer reactor length is going to certainly affect the effluent that's being produced. So those are the things. And I want to just talk briefly about Dr. Sun's opinion. It was cited. You know, Dykin's counsel didn't read into the record the Appendix 20, but it does cite Exhibit 2016, which is Dr. Sun's opinion, at Paragraph 49. So that is part of the record that was relied upon by the Board in its decision. And if we go back to Paragraph 49, which is in Appendix 2803, she states, One of ordinary skill in the art at the time of Ms. Takahashi's experiments knew that thermal dehydrofluorination could occur in a hasteloid tube without the aid of a catalyst. And she supported that opinion with Miller, 42, and the 281 patent as well. And that's not the only time she says it. If we go back to Appendix 16, which is the Board's summary of our argument, Comoros' argument, they cite to a couple of other paragraphs of Dr. Sun's, Paragraphs 39 and 45. And those are Appendix 2800 and 2802. She says the same thing, basically, that the effluent is going to change with a much longer reactor. So there's that evidence as well, to Your Honor's point. The 281 patent is cited separately in the Board's decisions. That is also substantial evidence that supports an affirmance. And in Appendix 21, the Board does cite to and discusses Ms. Takahashi's own admission, where he says, yeah, that could happen. Now, he tries to downplay it and says that he doesn't think it's going to progress that much. But that is evidence that it could happen. And that is a material difference in deviation from Miller Example 1. So one more thing is that Daikin did not meet its burden to show why the deviation in the experiments were made. And I think that's the other point that I wanted to make. And just on the waiver, Daikin objected to Miller 42 in the proceedings below, but never moved to exclude that evidence from the trial. And so, therefore, it was admitted and can be relied upon by the Board in its decision. So that is a waiver there. And, therefore, once it's entered into the trial and it's admissible, the Board can rely on it. You're talking about Daikin's failure to exclude a portion of a reference that it relied on as prior art. Why on earth would any sane person do that? Well, they could exclude it for purposes of the truth of the matter, using it for the truth of the matter asserted. But they can certainly rely on it for what it describes and discloses. Of course, that's what the Board did is rely on it for what it discloses and teaches under the rules, and it was appropriate for the Board to do that. It wasn't looking at it for the truth of the matter asserted. If there are no further questions, I think I've made my points. I yield my time. Thank you very much. Very briefly, Judge Hu's question about whether it was just an impurity, I think one answer to that is that, unlike every other obviousness case, the patent donor did not put into the record any secondary considerations of non-obviousness. With regard to the waiver, as Chief Judge Prost said, there's no way we could, A, why would we possibly think to seek to exclude a portion of a reference that we relied on, and B, the error, what we believe to be the error of the Board's way, was not apparent until the final written decision. With regard to Dr. Sun, it seems unfair and abusive for Kim Morris to rely on Dr. Sun's testimony. The 281 patent, by the way, is the same issue as Miller. And not consider our arguments that Dr. Sun's data and experiments, which sought to demonstrate her concept, to prove her concept about the effect of the catalyst-free zone on dehydrofluorination, simply would not account for the volume of impurities that Mr. Takahashi found. Does she have any further questions? Thank you. We thank both sides in the cases submitted. The next case for argument is 18-2094, Unilock v. Atkin.